First case is Ai-Wen v. New York City Regional Center, LLC Counsel, Mr. Halpin, you have reserved two minutes for rebuttal, I believe. Let's give you eight minutes to start. Yes, Your Honor. Thank you. Just give me one second. All right. You may proceed. Good morning, Judge Sullivan, and may it please the court, Stephen Halpin from Fort O'Brien-Landy on behalf of plaintiff's appellants. As detailed in the appellant's over 200-page complaint, including the well-pledged allegations therein, and all reasonable inferences therefrom, this case is about a carefully choreographed, managed fraud on over 100 Chinese foreign investors who were seeking both green cards, permanent residency in the United States, as well as a safe investment. And they were told repeatedly, as part of this campaign waged by Appellate New York City Regional Center, that the investments would be safe, that they would be supported by significant government funding. I guess, I mean, the real issue, I suppose, is did they have obligations to get the full documents that they were signing, to have them translated into English, and then to also review documents that were referenced, and, in fact, representations made that they read the other documents before they can bring a claim of fraud like this, or at least that they're on notice of the fraud as a result of documents they should have read. Certainly, and I think the answer is no, and I think the district court got the inquiry notice question wrong on both that point and on the point that, even if they had received the documents, particularly the offering memoranda, that they would have been on inquiry notice. And as to the first point, again, the appellee engaged two Chinese-based marketing agencies, predominantly, to conduct these seminars using glossy brochures, misleading information about the nature of the project. I don't think anyone's contesting that there was a fraud that was perpetrated beginning in 2011, but the question is, were these actions timely, and did your clients take timely action to identify and discover the fraud and bring the fraudulent parties to hold them to liability? And having signed numerous documents that, without getting copies of the originals and examining them or getting any advice, again, starting in 2011, it's a little hard for me to understand how they can now bring an action in a timely way. So, Judge Carney, to answer your question, as the plaintiffs have alleged, the appellee tightly controlled the flow of information to these prospective plaintiffs and investors. In fact, we have a recording, a transcript of which was attached to the complaint, in which an employee of the appellee is telling the Chinese marketing- It may be, but these were $500,000 investments. They were sophisticated investors. Didn't they have a duty to inquire, to get copies of the documents, to get translations? Judge Shin, I think that they certainly discharged their duty, and I think the cases are clear, particularly this one. The allegation is that they never got the offering memorandum. Is it acting with diligence when you don't ask for the offering memorandum? In these particular circumstances where you have the appellee who has control of those documents and who has instructed the one soliciting the investments to use high-pressure sales tactics in order to obtain signatures, and in fact, we've pointed to at least two instances in the complaint. They're at A139, paragraph 39. Is it acting with due diligence not to ask for translations of the documents, not to ask for copies of the offering memorandum? I think in this particular circumstance, because for the vast majority of these investors, the only thing they received was a signature page of the subscription agreement, and the subscription agreement's signature page- is it acting with due diligence to be presented with just a signature page and then to sign it when you know you're forking over $500,000? In these circumstances, I think it is, and I think there's at least a factual dispute that should be not resolved at a motion to this stage. You're saying it is acting with due diligence to hand over $500,000 and sign the signature page where you don't have any other documents. You have an idea of what you've been told. That's due diligence on the part of the investor? I don't think it's correct to say there are no other documents provided. They were provided extensive, glossy marketing materials. They were also provided regular updates during the course that the project was underway. So they were entitled to rely on marketing materials and sign a signature page attached to documents that they had never seen? I'm sorry. They were entitled to rely on the representations made to them orally in Mandarin. None of them spoke English. They were approached or attending these seminars in China. The seminars were conducted in Chinese. I don't think there's any dispute that none of the investors read or write English fluently. The case law is that you have an obligation if you don't speak English or you don't speak the language of the contract to have it translated or to get somebody to explain it to you, right? Well, so as far as those cases go, which do not involve the additional circumstance we have here where there are affirmative efforts to withhold the underlying documentation, in those cases, in the vast majority of those cases, if not all of them, the plaintiffs or the parties at issue were provided with the documents in English, the entirety of them. And, yes, it was incumbent upon them to have the entire documents they were presented with translated. But I think that's a different situation than what we have here, which is only a signature page of a subscription agreement for the vast majority of investors, which does not reference any of the other documents. And, in fact, Judge Lyman focused specifically on the offering memoranda, right? The offering memoranda are not referenced on the signature pages. They are folded into the subscription agreement that the investors didn't see. They're cross-referenced. It's not in boldface. It's not called out specifically. So what we have here is kind of a web of agreements resting behind the single signature page that does not reference anything else. And that distinguishes this case. Well, you know, if we just look at the signature page, I'm assuming this is reflective. I mean, it would be pretty silly of someone just to sign this page with nothing else but the signature page. I'm looking at A293. Yes, Your Honor. I suppose that. It says in witness whereof the parties here to have executed this agreement. It says page 6 at the bottom. So whoever's signing it should know that this is a six-page document. Right. And I think we have allegations, again, as I alluded to, at least two instances referred to specifically in the complaint where plaintiffs asked for more information, asked for those documents. I guess the point is, I mean, you're asking, you're saying that that's enough for due diligence. By the way, can I have those documents? No. And then you're okay to just sign? That's your due diligence? You asked once, and then you sign a document hoping that the other five pages don't contain disclosures that would be deal breakers? I would say yes, Your Honor. We have over 100 plaintiffs. I think whether it's, I don't know that there's a numerical threshold, but certainly for over 100 folks, they thought this was a reasonable step to take. They relied on the oral misrepresentations made by a police agent. They were given regular updates as the projects progressed that continued to mislead them and conceal issues with the projects. And so, yes, I think it's a question for a jury, not one to be decided on a motion to dismiss. So the fact that, I mean, if there's more people who have done this that support an inference that this was reasonable? I think there's a suggestion. Sorry, Your Honor, if I may finish. Go ahead. I'm not saying, I'm not articulating a test, but I'm saying that's certainly suggestive of what an objective person in their circumstances would think, and that's a jury question, not one that should be decided under the exception that was applied here, where you can rule on an affirmative defense on which the defendant will bear the burden at trial, and that you can dismiss what we maintain is a clear case of fraud on those grounds for 107 individuals. Thank you. All right, thank you. You have reserved two minutes for rebuttal. We'll now hear from Mr. Silbert. Good morning. Greg Silbert from Weill for NYCRC. As the plaintiffs concede at page 11 of their reply brief, the loan documents here contradicted the alleged oral misrepresentations that the plaintiffs assert in their fraud claim. That means that the plaintiffs were on inquiry notice at the time they entered into the transactions in 2011 and 2014, and because they were on inquiry notice, they had a duty to inquire. They concededly did not make any inquiry at that time, so knowledge of the alleged fraud is imputed to them at the time they entered into the transactions, and that means, as Judge Lyman found, these claims are untimely. Can you enlighten me to the nature of the U.S., the federal government's approval of the visa issuance or green card issuance in this program in particular? I believe I saw a reference to that, and thinking about the remedies that might be available to your adversaries' clients, I wondered if you could enlighten me about the nature of that approval and whether that might have carried some weight in the decision to invest that these individuals made. I mean, I gather they got their green cards, but can you help me with that? Yeah, absolutely, Judge Carney. So the federal EB-5 program requires that foreign investors make an at-risk investment, so it's required under federal law that the money be placed at risk. It can't be a completely secure investment. It's the responsibility of the fund manager, my client, NYCRC, to ensure that the investment meets the federal requirements for EB-5. Shortly after the investment is made, all of the plaintiffs submit to the federal government an application which attaches all of the documents that they claim they were not provided here. The federal government reviews those documents, and if it meets the EB-5 requirements, these plaintiffs receive first what is conditional residency. All of the plaintiffs got that. Then the investment has to be maintained over a certain period of time, and it has to create a certain number of jobs in the United States. If that requirement is met, then ultimately all of the plaintiffs get permanent green cards, which is permanent lawful residency in the United States for not just themselves but for their families too, their spouses and their children. So it's undisputed here that all of the plaintiffs ultimately got permanent residency. Does that help, Your Honor? Yes, I think so. They didn't get any money back. No, they didn't get money because the borrower went bankrupt. You know, like two years after the project was finished, the borrower was embroiled in litigation with a contractor and ultimately went bankrupt and didn't pay back the loan. And they would have been entitled to bring a claim for financial fraud of some kind had they acted earlier. Well, we think that claim would have failed, but we're assuming for purposes of this motion that the allegations in the complaint are true. As Judge Lyman found, all of those claims are untimely by years because as brought up by the colloquy with my friend on the other side, these plaintiffs clearly had inquiry notice at the time of the investment. They concede that the loan documents contradict what they allege are the oral misrepresentations. The court inquired about the duty to obtain other documents. That duty is clearly set out in law in, for example, the Holcomb case from the appellate division. That case does also involve foreign language speakers, and the law is clear under that decision, other appellate division decisions, under this court's decision in Ragon that if you are not proficient in English, it is your obligation to have the documents that you sign translated for you so that you understand them. I think that principle alone, which is uncontroverted here, is enough to dispose of this entire case. But on top of that, I believe I heard my friend say that there was some kind of instruction not to read the documents. You know, they alleged that for maybe two or three of these hundred or so plaintiffs. But even as to that, if you read Sharma v. Willia, which is a New York appellate division case from 2022, same thing. The plaintiff there alleged that there were oral misrepresentations about a lease. It turns out they were contradicted by the lease documents themselves. The plaintiff said, well, the defendant told me don't read the lease. And the court said, doesn't matter. It's your obligation to read the documents that you sign. You are bound by that. And that case also had the fact that plaintiffs alleged here that the plaintiff did not or supposedly did not have the documents available to her prior to the closing. The court said, again, doesn't matter. That's on you. You are supposed to go out and get them. There are any number of cases that stand for that same proposition. And even our friends on the other side acknowledged at page 26 of the blue brief that that principle is not, I think they call it non-controversial or unremarkable. The idea that you were bound by the documents you signed, that you were bound even if you only get a signature page, and that if you don't speak English, it is your obligation to have the documents translated so that you understand the obligations that you're assuming. When you enter into a transaction like this, and that is particularly true where, as you observed, Judge Chin, these are sophisticated plaintiffs. Each one of these plaintiffs is investing $500,000 in this investment opportunity. So it is incumbent on them to have the documents read to them so that they understand what they're investing. If the court has no further questions about the fraud claim, I can turn to breach of fiduciary duty. So the breach of fiduciary duty claim was properly dismissed under the business judgment rule as Judge Lyman said. You didn't argue statute of limitations as to this claim? Is there an issue as to why wasn't that? Well, so the plaintiffs alleged a series of kind of ongoing events that they said were defaults that we should have called. We don't think any of them actually were defaults. We dispute that we even could have called the default. But it doesn't really matter because all of those decisions were protected by the business judgment rule. Going to your question, Judge Carney, about how the federal program works, these plaintiffs only get green cards if the money remains invested for a period of time required under federal law and the money remains at risk for that time and there's a certain amount of jobs created for the investment. And so had NYCRC called the default, the program no longer would have qualified under the EB-5 requirements and these plaintiffs would not have gotten their green card. And as you know, the stated investment objective for this investment was to qualify for EB-5 permanent residency, right? So had NYCRC called the defaults that plaintiffs now say they should have called, these plaintiffs would not have gotten their green cards. So that is clearly a decision that falls within the business judgment rule. And the only argument that my friend on the other side has made is, well, these defendants were self-interested because they received management fees as long as the investment remained in place, but not if the investment was called into default or something like that. Well, as Judge Lyman found, that is not self-interest that takes the manager's decisions outside of the business judgment rule. That's clear from the appellate division case law like Owen against Hamilton. It's also plain from the face of these documents. Again, I mean the whole purpose of this investment is to qualify for a green card. And I take it the green cards are not at risk in any way by the financial failure of the project. Absolutely right, Your Honor. All these plaintiffs have permanent residency and they're going to keep permanent residency. And it is, again, it's a requirement of the program that the investment be placed at risk. In other words, the federal government is attracting risk capital from foreign investors that would not probably be invested on the same terms in the United States. But I'm sure that they're not interested in attracting fraudulent programs. No, no, of course, Your Honor. And of course, you know we deny that there was any fraud here. But this is a motion to dismiss. But is your point, Mr. Silver, that the appetite for risk and the willingness of a fiduciary to call out what is a problematic or really troubling project would be skewed by or would be affected by the fact that, well, there's this green card kicker. And so their appetite for risk is much higher because of that? Is that the argument? Not that, Judge Sullivan. It's just that there's a business judgment that needs to be made. Right, that's always the case. And so I guess that's the question I'm asking. So if this crosses the threshold of what any reasonable fiduciary would say is acceptable, and they would have blown the whistle on this or alerted the investors to the problems, then it doesn't really matter whether this is an EB-5 program or not. I'm trying to figure out, does the fact that there is this other incentive alter the business judgment rule? I don't think it alters the business judgment rule, Judge Sullivan. What I think it does is it places this decision squarely within the business judgment rule. So plaintiffs, therefore, have the obligation to show why the BJR doesn't apply. And their only argument in that regard is the defendants were self-interested because they received management fees. And as Judge Lyman found, that doesn't do it because all fund managers receive management fees. They're not always self-interested in every decision they make that preserves the fund, especially when preserving the fund is the stated investment objective in these documents. Even apart from the BJR, we ought to win on breach of fiduciary duty because of the exculpation clause and also because of the causation argument that we set out in our briefs. Thank you, Mr. Sullivan. Thank you very much. We'll now hear from Mr. Halpin for two minutes of rebuttal. Thank you, Judge Sullivan. Just very briefly picking up on the business judgment rule, the arguments on exculpation clause and what else are not passed on below and are not, we believe, a proper basis for this court's decision. And we do believe that there is a prima facie case that NYCRC was self-interested in not declaring these defaults. Mr. Sullivan has just said, and I think he's right, that your only argument is really self-interested. That's correct, Your Honor. Right? That's the only prong. And we think that we've made that case because, again, they're the only managing member. This is not an instance where there is a disinterested special committee that's been assigned. In these facilities, they are the only managing member. They have the sole power, and they're collecting millions of dollars in fees while this money remains loaned out. And so we think that's a prima facie case of self-interest, and simply securing the green cards is not the entire benefit of the bargain here. They were led to believe that these were safe investments. They expected a return on their investment. If certain investors had been told, you may get your green card, but you're getting zero of your half a million dollars back, then that might have changed the calculus. And then just to pivot very quickly, what's relevant, I think, to the business judgment rule argument. It seems to me fiduciaries are routinely getting paid fees. And your view is that that makes them self-interested? This is a pretty broad rule that you're asking us to enact. No, I don't think so because we only have one managing member here, and what they're receiving is different in kind completely than the other non-managing members, which are a stream of very small interest payments while the loans are outstanding. I don't think it's on all fours. But there are fiduciaries in any number of contexts who are getting fees for what they're doing. Yes. So it seems to me that the rule you're asking us to articulate is one that would also make them self-interested. The only narrow relief we seek is that we've established a prima facie case of self-interest. And if I could just very briefly, Your Honor, if you don't mind, address specifically on the Phase 2 investors. Even if they had received the offering memorandum, it would not have alerted them to the fraud. They would not have been on inquiry notice. The whole premise behind the Phase 2 investors was that there had been a successful Phase 1 completion. That's how it was marketed orally, and that's what the offering memorandum to the Phase 2 investors said, when in fact that was not true. The reason for the Phase 2 raise was because Phase 1, quote-unquote Phase 1, had encountered significant cost overruns that NYCRC concealed from investors. And that was in 2014, right? Yes. The Phase 2 investors were in 2014. That's correct. And the suit was brought in 2022? That's correct, Your Honor. If I may just respond very briefly. I think as we've outlined and as we've briefed, we think there is evidence of active concealment between the years of 2011 and leading up to when we think it would be timely. So we have not abandoned our argument that this would fall within the six-year statute of limitations based on equitable tolling and based on the active concealment by Appley. With that, thank you, Your Honors. We respectfully request that you reverse the remand. Thank you. Thank you, Mr. Halpern. Thank you, Mr. Silver. We will reserve decision.